## Johnson v. Commonwealth.

June 3, 1949.

Duncan & Duncan, J. M. Kennedy and Flowers & Pritchard for appellant.

A. E. Funk, Attorney General, and Zeb A. Stewart, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

The appellant, Paul Johnson, shot and killed his son-in-law, Perry Garner, and upon his trial under an indictment charging him with the crime of willful murder was convicted and sentenced to imprisonment for a term of five years. It is conceded on this appeal that the evidence was conflicting and sufficient to take the case to the jury. The grounds urged for reversal of the judgment concern only the admission of testimony.

The Commonwealth introduced as a witness Joe Hall Johnson, the eleven year old son of appellant, and attempted to prove by him that when he returned home with his father immediately before the difficulty the latter procured a pistol in the house and went to the yard where the deceased was engaged in an argument with appellant's daughter, who was deceased's wife. The deceased and his wife had separated, and the former was living at his father's home and the latter at her father's home. The witness, Joe Hall Johnson, testified that he and his father drove to the home of a neighbor and upon their return to his father's home he saw his sister and Perry Garner sitting in the front yard. Appellant went in the house and left by the front door near the place where the deceased and his wife were sitting. The witness remained in the house with his brother and listened to the radio. Soon after his father went through the front door he heard the report of a gun. He was asked what, if anything, appellant had in his hand when he left the house, and the witness answered: "He never had a thing." The Commonwealth then undertook to contradict the witness by showing that he had testified at a court of inquiry, held shortly after the killing, that

his father went in the house and got a pistol. It seems that the examining trial was postponed, and the deposition of Joe Hall Johnson was taken in the office of the County Attorney. The stenographer who took the deposition in shorthand and transcribed the notes was introduced by the Commonwealth, and she stated that the witness, Joe Hall Johnson, testified on the former occasion that his father went in the house, got a pistol, and came out with it. The defendant objected to all the contradictory testimony. It is argued that the witness merely failed to testify to facts which the Commonwealth hoped to prove by him, and that it was error to permit the Commonwealth to impeach its witness by proof of former statements. Appellant cites and relies upon Johnson v. Commonwealth, 227 Ky. 153, 12 S. W. 2d 308, 309, where the court said:

"True, section 596 of the Civil Code authorizes 'the party producing a witness' to 'contradict him by other evidence, and by showing that he has made statements different from his present testimony.' But this rule has been restricted to cases in which the evidence of the witness is prejudicial to the party producing him and has never been applied to cases in which the witness merely fails to prove what is expected of him and says nothing to prejudice the party's case."

Here, the witness made a statement prejudicial to the party producing him. Whether or not appellant went in the house and procured a pistol before going in the yard where his son-in-law and daughter were in conversation had an important bearing on the question of malice and intention. It follows that it was competent for the Commonwealth to contradict the witness by showing he had made statements different from his testimony. Harvey v. Commonwealth, 287 Ky. 92, 152 S. W. 2d 282. Furthermore, the evidence, even if it had been incompetent, was not prejudicial since the appellant, when he took the witness stand, testified that he went to his room, got the pistol, and left the house with it in his hand. It is insisted that even if the contradictory evidence was competent, it was the duty of the court to admonish the jury as to its effect although no request for such admonition was made. It was held in Blackerby v. Commonwealth, 200 Ky. 832, 255 S. W.

824, and one or two other early decisions, that an objection to the introduction of the evidence saves the point, but we have held in more recent opinions that, the evidence being competent and the objection to its introduction having been properly overruled, an admonition, where proper, must be requested. Clair v. Commonwealth, 267 Ky. 363, 102 S. W. 2d 367; Hedrick v. Commonwealth, 267 Ky. 481, 103 S. W. 2d 111; Stigall v. Commonwealth, 257 Ky. 342, 78 S. W. 2d 22. In Harvey v. Commonwealth, 287 Ky. 92, 152 S. W. 2d 282, 285, it was said:

"It is suggested that the court erred in failing to admonish the jury that this evidence could be considered only for the purpose of effecting Sexton's credibility as a witness. But, conceding for present purposes that such an admonition would have been proper, no request for an admonition was made and appellant must be deemed to have waived his right to it."

Appellant was asked on cross-examination if he stated in the presence of Rev. J. L. Dixon in the county jail "I lost my temper and killed him." Rev. J. L. Dixon, pastor of the Methodist Church in Albany, was introduced as a witness in rebuttal, and testified that he visited appellant in the county jail on the night of the day that Perry Garner was shot and that appellant made the statement in the course of a conversation with the witness. The testimony was objected to on the theory that the statement was a privileged communication under section 606(4) of the Civil Code of Practice, which provides:

"* * * nor shall a clergyman or priest testify concerning any confession made to him, in his professional character, in the course of discipline enjoined by the church to which he belongs, without the consent of the person confessing."

There is nothing in the record tending to indicate that the communication to the witness was penitential in its character or that it was made to him "in his professional character, in the course of discipline enjoined" by the rules of practice of his denomination. It does not appear that the conversation between the minister and appellant, during which the statement was made,

was connected in any way with the discipline of the church. The statement was made in the same manner it would have been made to any other visitor. The visit of Mr. Dixon to the jail where appellant was incarcerated was voluntary on his part and unsolicited. There is nothing in the record to indicate that appellant belonged to the Methodist Church or any other denomination or that he made the statement in question because of some supposed religious duty. The common law rule that communications to clergymen are not privileged has been changed in most of the states by statutes similar to ours. The rule deducible from the cases construing these statutes is stated in 58 Am. Jur., Witnesses, section 532:

"The tendency of the courts is toward a strict construction of statutes making communications to clergymen privileged, and, generally speaking, only those communications are privileged which are made under the exact conditions enumerated in the statutes. It must affirmatively appear that the statements to the minister or priest are made to him in his professional character, and in the course of discipline enjoined by the rules of practice of the denomination to which the minister belongs. And so it has been held that the communications protected are limited to such as are penitential in their character, or are made to clergymen in obedience to some supposed religious duty or obligation, and do not embrace communications to clergymen, however confidential, when not made in connection with or in discharge of some such supposed religious duty or obligation, or when made to them while in the discharge of duties other than those which pertain to the office of a clergyman."

We find no error prejudicial to appellant's substantial rights, and the judgment is affirmed.